STOCKTON v. FORD MOTOR CO.

No. 2307.

District Court, D. Idaho, S. D.

June 18, 1945.

J. M. Lampert and J. B. Musser, both of Boise, Idaho, for plaintiff.

William W. Ray, of Salt Lake City, Utah, and Jess Hawley, of Boise, Idaho, for defendant.

CLARK, District Judge.

The question presented in this case is whether plaintiff is entitled to relief under the Soldiers' and Sailors' Civil Relief Act of 1940, 50 U.S.C.A.Appendix, § 501 et seq.

The plaintiff, on the 21st day of December, 1938, and for some time prior thereto and until the 26th day of August, 1942, was engaged in the business of selling Ford automobiles and accessories, and operating a general garage business at Emmett, Gem County, Idaho, under the style and name of Stockton Motor Sales.

On the 26th day of August, 1942, he joined the military service of the United States of America, and served until the 14th day of October, 1944, when he was honorably discharged.

On December 21, 1938, the defendant entered into an agreement with Stockton-Adams, Incorporated. This contract was later assigned to the plaintiff herein with the consent of the defendant and was in full force and effect between the plaintiff and defendant on the date of plaintiff's enlistment,—the 26th day of August, 1942.

This contract is very lengthy and, without setting it out in full, it is sufficient to say here that it gave the plaintiff the right to handle and deal in Ford passenger automobiles, commercial automobiles, parts and accessories, that is, the products of the Ford Motor Company. The contract contains the following provision:

"This agreement may be terminated at any time at the will of either party by written notice to the other party given either by registered mail or by personal delivery * * *

"That in case of termination by Company, notice of intention to so terminate

shall be given to Dealer sixty (60) days prior to actual termination date, * * *"

Sometime prior to August 26, 1942, the operation of a business such as the business of the plaintiff was greatly curtailed through the Government's freezing order on the sale of automobiles and tires, and the rationing of gasoline. Although the importance of this is doubtful in the present case, considerable stress was laid on the fact that the plaintiff reduced his inventory of cars and parts in the handling of his business, which the defendant claims was not justified. Whatever reduction was made, however, was made after consultation between the plaintiff and defendant herein. At least the defendant advised the plaintiff to make such reduction as he felt that he should make in order to keep his finances in shape to tide him through the period of time when his business would be curtailed by reason of the war. The plaintiff reduced his investment to about $13,000.

Thereafter plaintiff felt that he should enter the armed service and so advised the defendant. The defendant congratulated him on his decision and assured the plaintiff that it would co-operate with him while he was in the armed service.

The plaintiff arranged for the handling of his affairs by having one man as financial manager and another man as manager of the business, and left for the service. Later both of these men were called to the service.

While he was in the service, without his being advised in any way by the defendant, negotiations were entered into between a competitor of the plaintiff doing business at Emmett, Idaho, and the defendant Ford Motor Company for the issuance of an agency contract to this competitor, which negotiations resulted in the competitor getting the business of the plaintiff during plaintiff's absence. After these negotiations were completed, orally, which was sometime in the fall of 1942, the defendant, on January 13, 1943, advised the plaintiff by mail that rather than serve formal notice on him to terminate the agency in accordance with the provisions of the contract, they wished his resignation, and if they did not receive it within a reasonable time they would proceed with formal termination. The plaintiff did not resign as requested and the defendant on January 21, 1943, served notice of intention to termi-

nate the contract and on April 5, 1943, served notice of termination.

A great deal of evidence has been introduced in an attempt to justify the defendant in cancelling the contract, and the matter as submitted to the Court is:

First: Was the defendant justified in cancelling the contract in view of the understanding had with the plaintiff before he entered the service?

Second: Did the defendant have the legal right to terminate the contract under its provisions by giving the notice stipulated in the contract while the plaintiff was serving in the armed forces of the United States?

The second proposition would appear to be the controlling one. However, the Court is of the opinion that the first is equally important.

We have witnessed the young men of our nation, daily for over four years, entering the armed forces of our country. Radios, newspapers and orators have been praising these young men who were willing to leave for the battle fields and risk their lives for the preservation of this country. We have said to them how much we appreciated the sacrifice they were willing to make for us who stayed at home, just as the defendant in this case congratulated this plaintiff, and told him that while he was away on the battle field it would co-operate with him, and then, without advising the plaintiff, entered into negotiations to give his contract to a competitor.

The Court was very much impressed by the evidence offered as to the effort on the part of plaintiff's competitor to obtain this contract during plaintiff's absence in the armed service. No one should try to enrich himself at the expense of one who is away offering his life for his country; such action cannot be justified, nor can the defendant justify itself,—after cheering the plaintiff on his way and assuring him of its co-operation,—in entering into negotiations with his competitor to take from the plaintiff his contract and thereby destroy his business investment while he was in the service.

The plaintiff comes to this Court for relief; he is a soldier returned from service in this war with an honorable record. Before he left for the service he had a profitable business; he had a valuable agency contract with the defendant. When he made up his mind that it was his duty to place himself at the disposal of his coun-try he knew that it would be necessary to leave his business; he knew that there was a clause in his agency contract with the defendant whereby it could cancel and terminate this contract on sixty days' notice; he intended to find out what the result of entering the service would mean as far as this contract was concerned and he advised the defendant of his intention. The defendant congratulated him and said that it would co-operate with him. There is only one fair construction which can be placed on this conversation, and that is, that no advantage would be taken of the plaintiff during his absence. Defendant gave him to understand by using the word "co-operate" that they would waive the right to terminate this contract. There was a consideration for this promise,—his service in the Army. The Court recognizes this is a strained construction but we are dealing here with a returned soldier who entered the service with a pledge of co-operation by the defendant. Defendant violated that pledge and terminated a contract which plaintiff had every right to believe would not be terminated during his absence.

When the defendant told the plaintiff that it would "co-operate" that included the promise to aid him; to help him; to work together in their understanding and agreement; that they would unite with him in helping for their mutual benefit. All standard dictionaries give this as the meaning of the word. True, there was no direct promise but there was an implied contract that he would not be injured by any act of the defendant. Equity and justice requires that the defendant should live up to its agreement. Answering the first question, the defendant had led the plaintiff to believe that his contract would remain in force during his absence in the service, and it was not justified in the cancellation of the contract.

Answering the second question, the defendant did not, under the facts as shown by the evidence, have the legal right to terminate the contract.

The Soldiers' and Sailors' Civil Relief Act of 1940 and its 1942 amendment was passed by Congress as a promise to the men and women in the military service that they would be free from harassment and injury in connection with their civil affairs while they were in the service. It was very important that those entering the service be freed from mental worry over

their civil affairs at home. The Act reads in part: "In order to provide for, strengthen, and expedite the national defense under the emergent conditions which are threatening the peace and security of the United States and to enable the United States the more successfully to fulfill the requirements of the national defenses, provision is hereby made to suspend enforcement of civil liabilities, in certain cases, of persons in the military service of the United States in order to enable such persons to devote their entire energy to the defense needs of the Nation, and to this and the following provisions are made for the temporary suspension of legal proceedings and transactions which may prejudice the civil rights." 50 U.S.C.A.Appendix, § 510.

If any relief is provided in the Act it is provided by Section 522, U.S.C.A.Appendix, Title 50, which reads as follows: "And in any case where a person fails to perform any obligation and a fine or penalty for such nonperformance is incurred a court may, on such terms as may be just, relieve against the enforcement of such fine or penalty if it shall appear that the person who would suffer by such fine or penalty was in the military service when the penalty was incurred and that by reason of such service the ability of such person to pay or perform was thereby materially impaired."

It must be admitted, as contended by the defendant, that the plaintiff had no right which he could have maintained or protected to continue the sales agreement in force if he had never entered the military service and it also must be admitted that, if the agreement is restored, there will be nothing to prevent the defendant, after the time provided by law and the provisions of the contract, to proceed with its cancellation. It also must be admitted that there could have been no fine or penalty if the soldier had not entered the service, and if he had performed every act suggested by the agreement it nevertheless could have been cancelled by defendant, Ford Motor Company, at will. But we are not dealing with the plaintiff in civil life, we are dealing with him as a soldier in the service; the contract was in existence at the time this plaintiff entered the military service in August, 1942, and the evidence in this case is very clear that the contract was cancelled for one reason and that was because the plaintiff was in the service.

The statute itself is somewhat indefinite and there is a serious doubt in the Court's mind that this contract is covered by it. It is hard to conceive, however, of Congress saying in one breath that they were acting to "free persons in the military service from harassment and injury in connection with their civil affairs during their terms of service and thus enable them the more successfully to devote their entire energies to the military needs of the Nation * * *" and then read section 522 of the Act and say that the cancellation of this contract by the defendant was not a forfeiture covered by it. "Forfeiture is a penalty by which one loses his rights and interests in his property". Black's Law Dictionary, 3d Ed., p. 1345.

Certainly Stockton has been penalized and penalized severely in the cancellation of this contract by the defendant, and this has been imposed upon him during the time of his service in the armed forces of the United States of America, and in disregard of the purposes and intentions of the provisions of the Soldiers' and Sailors' Civil Relief Act, and in disregard of the promise made to co-operate with him which amounted to a binding agreement on the part of the defendant.

 Promises made to our service men are not to be construed as idle promises but should be construed as a solemn obligation that the agreements we have made with them will be lived up to and enforced. To look for technical loop-holes which may relieve us of our responsibilities is unthinkable where the returned serviceman's interest is at stake, and if there is a doubt as to whether a particular matter is within the scope of the Civil Relief Act, that doubt should be resolved in favor of the soldier, and in this case the cancellation of the contract is construed by this Court as a violation of the agreement and understanding had with the defendant at the time of plaintiff's entry into the service and also as an act prohibited under the Soldiers' and Sailors' Civil Relief Act. If the Court is wrong in its judgment, this law should be amended so that the men and women in the service will not be fooled into believing that his or her civil rights are secure while they are away fighting for their country.

The relief this Court can give will be short lived if the defendant is determined to cancel this contract, but the defendant

could not legally terminate it or cancel it while the plaintiff was in the military service, and the plaintiff should be restored to all of his rights and privileges under the contract as existing at the time of plaintiff's entry into the military service.

The complaint will be deemed amended to conform to the proof,

Counsel for the plaintiff will prepare the necessary findings of fact, conclusions of law and decree, serve a copy on opposing counsel and submit to the Court for approval.